IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **ROBERT ASHLEY ROBERTS and MELANIE WOODWARD ROBERTS,** | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) **CIVIL ACTION NO. 24-00460-KD-B** |
| **CARTER HILL CONSTRUCTION, LLC, and JOSEPH CARTER HILL** | ) ) ) ) |
| Defendants. | ) |

**<u>ORDER</u>**

This action is before the Court on Defendant's Motion to Stay Proceedings Pending Mediation and Arbitration, (Doc. 10), Plaintiffs' Response, (Doc. 13), and Defendant's Reply, (Doc. 14).

**I.    Jurisdiction**

Robert Ashley Roberts and Melanie Woodward Roberts ("the Roberts") brought action against Joseph Carter Hill ("Hill") and Carter Hill Construction, LLC ("CHC") in Baldwin County Circuit Court in November 2024. (Doc. 1-1). The action was removed to this Court on December 10, 2024. Removal to this Court was proper under 28 U.S.C. § 1441 as the Court has subject matter jurisdiction over the claim by diversity jurisdiction under 28 U.S.C. § 1332. The Roberts are citizens of Alabama and Carter Hill Construction, LLC and Hill are both citizens of Louisiana. (Doc. 1 at p. 4-5). The amount in controversy is $143, 198.70 which exceeds the $75,000 minimum required by 28 U.S.C. § 1332. (<u>Id.</u> at p. 4). Further, the Notice of Removal

1

was filed within 30 days of the service on the Defendant. (Id. at p. 3). Therefore, the Court has jurisdiction over this action.

## II.     Background

On October 6, 2022, the Roberts and CHC entered a "Residential Construction Contract" for CHC work for construction of a new home at 657 North Mobile Street, Fairhope, Alabama. (Doc. 10-1 at p. 1).[1] Leading up to the contract between the Roberts, CHC and Hill, CHC and Hill were experiencing liquidity problems which resulted in selling some sold receivables to merchant cash advance companies. (Doc. 1-1 at p. 3). According to the Roberts, CHC and Hill did not have proper funding to continue their ongoing projects. (Id.).

On September 16, 2022, Hill sent the Roberts a contract for the construction of their residence after a conversation on September 13, 2022 where cost estimates, material and design were discussed. (Id.). The Roberts, Hill and the architect went back and forth emailing where they discussed plans, specifications and made revisions to the contract. (Id. at p. 4). Once the Roberts informed Hill that they were hiring him, Hill and CHC applied for an Alabama homebuilder's license for the first time. (Id.).

Bob Roberts informed Hill that he would withhold 10% of the initial deposit until Hill and CHC received a Alabama Homebuilder License. (Id.). Hill kept pressuring the Roberts to pay the 10% and expressed concern that the subcontractors and vendors he claimed he received pricing from would only hold it open for 30 days. (Id.). However, the Roberts claim Hill and CHC had not received this pricing and were pressuring the Roberts because of the liquidity problems CHC

---

[1] The facts in this section are taken from Plaintiffs' Complaint (Doc. 1) or Defendants' Motion (Doc.10) and are not findings of fact by the Court.

was having. (Id.). The Roberts were unaware of such problems and state that it would have been material to their decision if they were aware. (Id.).

Effective October 6, 2022, CHC and the Roberts entered into a standard AIA agreement. (Id.). Hill and Bob Roberts signed the Contract. (Id.). On November 2, 2022, the Roberts paid the 10% of the deposit as specified in the Contract. (Id.). Hill represented to the Roberts that the money would be used to make initial deposits on materials for the construction. (Id. at p. 4-5). However, the Roberts claim Hill knew he was not going to use the money for the initial deposits but rather to help the liquidation issue at CHC. (Id. at p. 5). On December 6, 2022, Hill gave the Roberts a signed CHC's payment application #1 which showed that CHC had completed or partially paid for some materials for the construction. (Id.). Specifically, Hill represented on the payment application that 65% of the windows for the house were purchased with the deposit. (Id.). The Roberts allege that none of the windows were purchased. (Id.). Over the course of the construction, CHC submitted 11 payment applications to the Roberts that the Roberts claim contained at least 81 misrepresentations that material deposits or material purchases had ben completed. (Id. at p. 6). The 11 payment applications also indicated that 63% of the construction was complete; the Roberts claim that this was not true. (Id. at p. 7-8). In sum, the Roberts claim that Hill and CHC constantly misrepresented the work accomplished on the house and used their money for other projects. (Id. at p. 8).

In January 2024, Bob Roberts began investigating the representations Hill and CHC made about the construction. (Id. at p. 10). The Roberts were then forced by Hill and CHC to take over the project as they could not keep up payments for materials and subcontractors. (Id.). The total Bob Roberts determined Hill misappropriated was approximately $102,000. (Id.). Hill told Bob Roberts he would pay this amount back to him and produced a check for the amount. (Id. at p.

3

11). Bob Roberts drove to Baton Rouge, Louisiana where the bank that held the account was located and tried to get the check converted to a cashier's check, and the bank could not honor the check. (Id.). Hill then represented to Bob Roberts that he was waiting for a line of credit to hit the account. (Id.) But, several weeks later when Bob Roberts deposited the check to his personal account, it did not clear. (Id.). Hill delivered a certified check of $102,000 to the Roberts after the Roberts' lawyer served a worthless instrument letter on Hill and CHC. (Id.).

The Roberts believe Hill and CHC were involved in a scheme of selling receivables from the business to different factoring companies between July 2022 through December 2022. (Id. at p. 12). Due to the fraud the Roberts claim to have experienced, the Roberts claim they had to essentially repay for supplies and subcontractors for materials Hill and CHC claimed to have ordered but never did. (Id. at p. 13). Further, the construction of the house contained several errors and omissions from CHC and Hill. (Id.). Because of this, the Roberts have brought one count of fraudulent misrepresentation, one count of fraudulent concealment, one count of breach of contract, one count of negligence, and one count of wantonness against Hill and CHC. (Id. at p. 14-18).

### III.    Relevant Arbitration Provisions from the Contract

#### a. Contract Provision 5.1

**"Binding Dispute Resolution.**

> For any claim subject to, but not resolved by, mediation pursuant to Section 21.4, the method of binding dispute resolution shall be as follows:
>
>> Arbitration pursuant to Section 21.5 of this Agreement." (Doc. 10-2 at p. 4).

#### b. Contract Provision 21.1

> "Claims, disputes, and other matters in question arising out of or relating to this Contract, including those alleging an error or omission by the Architect but

excluding those arising under Section 16.2, shall be referred initially to the Architect for decision. Such matters, except those waived as provided for in Section 21.11 and Sections 15.6.3 and 15.6.4, shall, after initial decision by the Architect or 30 days after submission of the matter to the Architect, be subject to mediation as a condition precedent to binding dispute resolution." (Id. at p. 19).

    c. **Contract Provision 21. 4**

"If a claim, dispute or other matter in question relates to or is the subject of a mechanic's lien, the party asserting such matter may proceed in accordance with applicable law to comply with the lien notice or filing deadlines." (Id.).

    d. **Contract Provision 21. 5**

"Arbitration shall be administered by the American Arbitration Association, in accordance with the Construction Industry Arbitration Rules in effect on the date of this Agreement. Demand for arbitration shall be made in writing, delivered to the other party to the Contract, and filed with the person or entity administering the arbitration. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." (Id.).

**IV.    Analysis**

Hill and CHC move the Court to stay proceedings pending mediation and arbitration of the Roberts' claims under the Federal Arbitration Act. (Doc. 10-1 at p. 2). This motion is best construed as a motion to enforce arbitration.

"The decision to compel arbitration under the FAA depends on consideration of three factors, [ ]: (1) whether the parties formed a valid and enforceable agreement to arbitrate; (2) whether the agreement to arbitrate encompasses the underlying dispute; and (3) whether the underlying contract evidences a transaction involving interstate commerce." Sample v. Dollar General, 2023 WL 2252404, *4 (S.D. Ala. Jan. 6, 2023) (Report and Recommendation adopted by 2023 WL 2244686 (S.D. Ala. Feb. 24, 2023) (citing 9 U.S.C. §§ 2-3 and King v. Cintas Corp., 920 F. Supp. 2d 1263, 1267 (N.D. Ala. 2013)).

5

As to the first factor, the parties do not dispute the validity or enforceability of the Contract. Thus, the first factor is met. See Bazemore v. Jefferson Cap. Sys., LLC, 827 F.3d 1325, 1329 (11th Cir. 2016) ("The threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.'. . . . Absent such an agreement, 'a court cannot compel the parties to settle their dispute in an arbitral forum.'"); In re Checking Account Overdraft Litig., 754 F.3d 1290, 1294 (11th Cir. 2014) ("an order compelling arbitration is "in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate'"); Burch v. P.J. Cheese, Inc., 861 F. 3d 1338, 1346 (11th Cir. 2017) ("When, as in this case, a party moves a district court to compel arbitration under the FAA, the court must first determine whether 'the making of the agreement for arbitration or the failure to comply therewith is ... in issue.'") (quoting 9 U.S.C. § 4).

As to the second factor, the parties dispute "whether the agreement to arbitrate encompasses the underlying dispute." CHC and Hill claim that all claims by the Roberts are subject to mediation since they arise out of the Contract between the parties. (Doc. 10-1 at p. 2). Articles 21.1 and 21.5 provide that claims, disputes and other matters relating to the Contract, after initial decision by the architect, are subject to mediation and that arbitration shall be administered by the American Arbitration Association. (Id.). CHC and Hill argue that the Roberts are required to mediate any dispute. (Id.) Then, if mediation is unsuccessful, the parties may litigate or arbitrate at the election of CHC. (Id.).

Hill and CHC bring this motion under Section 2 of the Federal Arbitration Act which states in part: "A written provision in. . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction. . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

6

revocation of any contract." 9 U.S.C. § 2. Further, Hill and CHC note Alabama and Federal law favor resolving issues with arbitration even when a question of construction of the contract exists. (Id. (citing Premiere Automotive Group, Inc. v. Welch, 794 So.2d 1078, 1082 (Ala. 4/6/2001), citing: Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24-25 (1983)).

In response, the Roberts claim that Article 5.1 of the Contract narrowly define the types of claims and disputes to be resolved in arbitration. (Doc. 13 at p. 2). Specifically, the Roberts argue that their claims of fraudulent misrepresentation and fraudulent concealment do not fall within the scope of the arbitration provision. (Doc. 13 at p. 4). To support this claim, the Roberts use Liberty Finance v. Carson, 793 So. 2d 702 (Ala. 2000), as a case illustration. (Id. at p. 2). However, Liberty Finance is not illustrative here. Liberty Finance was a case of a borrower against a lender and insurer. Liberty Finance, 793 So. 2d 702. The arbitration clause in the contract between the parties stated: "'Any dispute, controversy or claim arising out of or relating to any benefits or coverage hereunder or the breach thereof, shall be settled by binding arbitration…'" Id. at 703. The Supreme Court of Alabama affirmed the trial court's determination that the scope of the arbitration agreement related to the benefits, coverage or breach of their agreement. Id. at 705. The Roberts claim that for the Court to find that all claims or disputes are subject to arbitration would be to ignore Article 5.1 of the Contract and would be contrary to Alabama law. (Doc. 13 at p. 3). However, in this case, the arbitration provision Article 21.1 is not narrowly tailored and refers to the Contract generally, unlike the arbitration agreement in Liberty Finance.

The United States Supreme Court precedent favors arbitration when a disagreement on the arbitrability of a claim exists. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460

7

U.S. 1, 24-25 (1983) ("The Arbitration Act establishes that, as a matter of law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]"); First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 945 (1995) ("issues will be deemed arbitrable unless "it is clear that the arbitration clause has not included" them[.]" (quoting G. Wilner, 1 Domke on Commercial Arbitration § 12.02, p. 156 (rev. ed. Supp.1993)). The dispute here is whether Article 5.1 limits Article 21.1. Article 21.1 in the Contract states that "[c]laims, disputes, and other matters in question arising out of or relating to this Contract…shall…be subject to mediation as a condition precedent to binding dispute resolution." (Doc. 10-1 at p. 2). Article 5.1 does not change that Article 21.1 provides that all claims are subject to dispute resolution. Although Article 21.1 does not reference Article 21.5, the reference is implied because Article 21.1 specifically provides for "binding dispute resolution." (Id.).

Further, Article 21.5 states that the American Arbitration Association will administer the arbitration. (Id.). "Generally, courts decide threshold "arbitrability" issues of whether the parties agreed to arbitrate, such as questions regarding the enforceability, scope, or applicability of the arbitration agreement itself." Whisenhunt v. Ameracat, Inc., 731 F. Supp. 3d 1279, 1296 (S.D. Ala. 2024), reconsideration denied, No. CV 1:23-00443-KD-B, 2024 WL 2139387 (S.D. Ala. May 13, 2024) (citing Attix v. Carrington Mortg. Servs., LLC, 35 F.4th 1284, 1295 (11th Cir. 2022)). However, when the arbitration agreement between the parties defers to the American Arbitration Association, it is clear "'that the arbitrator should decide whether the arbitration clause applies'" to the claims being asserted. Id. (quoting U.S. Nutraceuticals, LLC v. Cyanotech Corp., 769 F.3d 1308, 1311 (11th Cir. 2014)). So, the issue of whether the claims of fraudulent misrepresentation and fraudulent concealment are arbitrable are left to the arbitrator.

8

The third factor of "whether the underlying contract evidences a transaction involving interstate commerce" is met. The phrase "involving interstate commerce" carries a broad interpretation and is functionally equivalent to the phrase "affecting interstate commerce." Allied-Bruce Terminix Companies, Inc. v. Dobson, 513 U.S. 265, 273-74 (1995). The FAA falls within the Commerce Clause. Id. at 274 (citing Perry v. Thomas, 482 U.S. 483, 490 (1987)). Interpreting the phrase "involving commerce" is consistent with the FAA and places "arbitration provisions on 'the same footing' as a contract's other terms." Id. at 275 (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 (1974)). The Roberts do not dispute that the contract involves interstate commerce. And considering the nature of the Contract which involves building material for building a house, the Court finds that the Contract does involve interstate commerce. Accordingly, the third factor is met. See Doe v. Stoneridge Homes, Inc., No. 5:18-CV-2101-CLS, 2019 WL 1620363 *6 (N.D. Ala. Apr. 16, 2019) ("There has been no dispute, nor could there reasonably be, that the contract to construct plaintiffs' home related to a transaction involving interstate commerce.").

## V.     Conclusion

Applying the "liberal federal policy favoring arbitration agreements," the Court finds that these claims are subject to arbitration. Bazemore, 827 F.3d at 1329. Hill and CHC's motion to stay proceedings pending mediation and arbitration, (Doc. 10), is **GRANTED.** Accordingly, this action is **STAYED.**[2]

**The parties shall, on or before June 21, 2025, file a joint report to advise the Court as to the status of arbitration.**

---

[2] Section 3 provides that district courts should stay their proceedings in any action raising a dispute on an issue referable to arbitration. 9 U.S.C. § 3.

**DONE** and **ORDERED** this **20th day** of **March 2025.**

/s/Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**
